RENDERED: SEPTEMBER 28, 2017
TO BE PUBLISHED

Supreme Court of Kentucky

FINAL

2016-SC-000280-DG

DATE 10|19|17 Kim Redman, DC

BOARD OF COMMISSIONERS OF THE CITY                          APPELLANT
OF DANVILLE, KENTUCKY

ON REVIEW FROM COURT OF APPEALS
V.          CASE NOS. 2014-CA-001300 AND 2014-CA-1301
            BOYLE CIRCUIT COURT NO. 12-CI-00482

ADVOCATE COMMUNICATIONS, INC.                               APPELLEE
D/B/A THE ADVOCATE-MESSENGER

**OPINION OF THE COURT BY JUSTICE VANMETER**

**AFFIRMING IN PART
AND
VACATING IN PART**

Under Kentucky's Open Meetings Act, city council meetings are

presumptively open to the public unless an exception permits a meeting to be

closed. The issue we address in this case is whether the Board of

Commissioners of the City of Danville ("Board") permissibly went into closed

session to discuss its intention to bid on real property offered for sale pursuant

to an absolute auction. Under the facts of this case, we hold that no exception

permitted the Board's action and affirm that portion of the Court of Appeals'

opinion. But because the Board's action was not willful, we vacate that portion

of the Court of Appeals' opinion remanding to the Boyle Circuit Court for an assessment of fees and costs.

## I.    Factual and Procedural Background.

For some time prior to 2012, the City of Danville needed space to house its public works departments. To accommodate its needs, it leased a portion of the Boyle Industrial Storage Company's property, and attempted to purchase or enter a long-term lease for the property in 2011. In 2012, the Board budgeted $2,000,000 for the purchase of real estate for its public works department. In July 2012, that property came up for sale at an absolute public auction. The auction was advertised and scheduled for August 10.

At its next regularly scheduled meeting, July 23, the Board went into closed session to discuss the auction advertisement. During the closed session, the Board authorized bidding at the auction up to $1,500,000, the amount for which the property appraised in 2007. In addition, the Board discussed using a bidding agent to conceal the City's interest and participation in the auction. The parties disagree on whether the Board decided to use a bidding agent at the July 23 meeting, or whether that decision was made by the City Manager following the meeting.

The next week, Danville's mayor signed a confidential Agreement and Bidding Instruction with a local realtor to act as the City's agent/bidder. The auction terms included a 10% buyer's premium on the successful bid. As a result, the Board's authorization limited the City's highest bid to $1,363,636, which together with the buyer's premium of $136,364, totaled $1,500,000. In

2

conjunction with that Agreement, the mayor and the agent signed a registration form with the auctioneer, and the agent signed an acknowledgement of Auction Terms and Conditions. The significant terms were that "[t]he successful bidder shall be required to enter into a non-contingent auction purchase agreement and deposit 10% of the contract price[,]" with closing to be held within 30 days. The property was offered AS IS, WHERE IS, and potential bidders were advised to conduct inspection prior to the auction.

At the auction, the City, through its agent, was the successful bidder at a total price, including buyer's premium, of $1,237,500. After the fall of the hammer, the mayor, the seller, and all participating realtors, signed the auction purchase contract whereby the City agreed to buy the property at a closing to be held within 30 days, subject only to a standard contingency that the City receive merchantable title via a general warranty deed, free and clear of all liens and encumbrances, except easements, covenants and restrictions of record. The mayor tendered the requisite 10% deposit check of $123,750. Significantly, the contract contained no contingency of Board approval.

A few days after the auction, at its August 13 meeting, the Board went into closed session to discuss the property's purchase. At the adjournment of the closed session, the Board openly and unanimously approved the purchase of the property. At its August 27 meeting, the Board, for the first time, publicly discussed the purchase in open session.

On August 30, the Danville Advocate-Messenger delivered a written complaint to the mayor regarding the July 23 meeting, and alleged that the Board had violated the Open Meetings Act, KRS[1] 61.800, *et seq.* ("the Act"). The Board failed to respond to the complaint, and the newspaper initiated an appeal to the Attorney General's Office.

The Attorney General issued a decision on September 28, 2012, that the Board had violated the Act. 12-OMD-179.[2] In addition, its decision ruled that the Board had also committed a violation in failing to respond to the newspaper's written complaint. The Board then filed this action in the Boyle Circuit Court, which upheld the Attorney General's determination, but denied the newspaper's request for attorneys' fees and costs on grounds that the violations were not willful. The parties filed cross-appeals to the Court of Appeals, which upheld the finding of an open meeting violation, but reversed the trial court's finding that the violation was not willful and remanded the case to the trial court for imposition of costs and attorneys' fees.

## II.    Standard of Review.

In this case, the trial court granted the newspaper's motion for summary judgment and denied that of the Board, implicitly concluding that a violation of the Act had occurred. We review open meeting determinations de novo. *Kentucky Bd. of Exam'rs of Psychologists v. The Courier – Journal & Louisville*

---

[1] Kentucky Revised Statutes.

[2] OFFICE OF THE KY. ATTY. GEN., OFFICE OF CIVIL AND ENVTL. LAW: OPEN RECORDS & OPEN MEETINGS, https://ag.ky.gov/civil/civil-enviro/orom/Pages/2012.aspx (last accessed Aug. 28, 2017).

4

*Times Co.*, 826 S.W.2d 324, 328 (Ky. 1992); *Webster Cnty. Bd. of Educ. v. Franklin*, 392 S.W.3d 431, 434–35 (Ky. App. 2013).

## III.    Analysis.

### A.    *Open Meetings Law.*

As noted, meetings of public agencies are open to the public at all times. KRS 61.810(1). This section states "[a]ll meetings of a quorum of the members of any public agency at which any public business is discussed or at which any action is taken by the agency, shall be public meetings, open to the public at all times." The legislative rationale is that "the formation of public policy is public business and shall not be conducted in secret." KRS 61.800. While exceptions to the open meeting requirement are set forth in KRS 61.810, KRS 61.800 provides that the exceptions are to be "strictly construed." No question exists that the Danville City Commission is a public agency required to open its meetings to the public. KRS 61.805(2)(c).

The Board in this case argues that an open meeting exception related to the acquisition of real property applies to its decision to bid on the property. This exception permits "[d]eliberations on the future acquisition or sale of real property by a public agency, but only when publicity would be likely to affect the value of a specific piece of property to be acquired for public use or sold by a public agency[.] KRS 61.810(1)(b). Significantly, this section exempts "deliberation[]," as opposed to "action taken." "Action taken" is defined, for purposes of the Act, as "a collective decision, a commitment or promise to

5

make a positive or negative decision, or an actual vote by a majority of the members of the governmental body." KRS 61.805(3).

**B.     *Acquisition of Real Property by Public Auction.***

The wrinkle that makes this case unique is the sale of the property by absolute auction. The Board argues that notwithstanding its "consensus" to bid at the auction, the City's purchase was still subject to Board approval following the auction in the event the city was the successful bidder. Unfortunately, the Board's argument fails based on basic principles of contract formation applicable to auction sales,[3] and, importantly, under the facts of this case.

When a seller places property for sale at auction, contract formation differs depending on whether the auction is stated to be "with reserve" or "without reserve." In an auction with reserve, the seller, in placing the property up for auction, is merely advising the public of its willingness to entertain bids. *See Puckett v. Dunn,* 529 S.W.2d 358, 359 (Ky. 1975) (stating an announcement of public auction is "a mere declaration of intention to hold an auction at which bids will be received. . . . It is a mere invitation to those attending the sale to make offers by bids[]"); *see also* Restatement (Second) of Contracts § 28(1)(a) (1981) (stating "[a]t an auction, unless a contrary intention

---

[3] The legislature has enacted several statutes governing auction sales of both real and personal property. *See* KRS 330.210, 330.220, 355.2-328. We do not purport to set forth definitive rules governing auction sales, but merely to note the principles of contract formation that are germane to this case, specifically relating to absolute auctions.

6

is manifested, the auctioneer invites offers from successive bidders which he may accept or reject[]"). Each bid constitutes an offer, which the seller is not obligated to accept. Conversely, in an auction without reserve, also commonly known as an "absolute auction," the seller, through it's agent, the auctioneer, is deemed to make an offer by virtue of putting the property up for auction. Each bid made on the property is an acceptance and therefore forms a contract, subject only to the contingencies of (a) a higher bid/acceptance or (b) the withdrawal of the bid made before the fall of the hammer, *i.e.*, the conclusion of the auction. *See* Restatement (Second) of Contracts, § 28(1)(b) (1981) (stating that "when goods are put up without reserve, the auctioneer makes an offer to sell at any price bid by the highest bidder[]").

### C. *Violation of Open Meetings Act.*

Here, the auction of the property was an absolute auction, an auction without reserve. Published terms and conditions set forth very minimal contingencies which might permit any buyer to cancel the transaction after the completion of the auction. Before the auction, the mayor and the bidding agent both signed the auctioneer's registration form, and the agent signed an acknowledgement of Auction Terms and Conditions. At that point, any privacy regarding the City's intention to bid was gone. And, following the auction, the mayor and bidding agent signed the auction purchase contract and tendered the 10% deposit towards the purchase price. We agree with the newspaper that the Board's decision to bid at an absolute auction did not fall within the open meeting exception for "[d]eliberations on the future acquisition . . . of real

7

property by a public agency, but only when publicity would be likely to affect the value of a specific piece of property to be acquired for public use[.]" The City's interest in bidding on the property could have been discussed in open session, giving all citizens an opportunity to discuss the idea without affecting the value of the property, to the City's detriment. The closed portion of the meeting, we believe, could have been used to discuss bidding strategy and the maximum price the mayor, or any other bidding agent, would have been authorized to bid. In that way, the exception for avoiding publicity likely to affect the value of the property would have been strictly complied with. As the matter transpired, the City ultimately was obligated to purchase the property, with the decision to bid on and to buy the property having been made in closed session in violation of the Act. The Board's post-auction approvals, albeit conducted in public, were window-dressing, because irrespective of the Board's arguments to the contrary, the City was already compelled to complete the purchase – or answer a complaint for specific performance.

We are not unmindful of the quandary that the Board faced. Public knowledge of the maximum bid approved in the closed session could easily affect both the bidding process and the purchase price of the property. However, the vote in open meeting for the City to bid on and potentially purchase the property would not require disclosure of the maximum authorized bid.

8

Thus, the decisions of the Attorney General, the Boyle Circuit Court and the Court of Appeals are all affirmed on this issue.

### D. *Willfulness of the Open Meetings Violation.*

The final issue concerns the willfulness of the Board's violation of the Act's requirement. Under KRS 61.848(6), the court may award costs, including reasonable attorneys' fees, to any person who prevails against an agency "where the violation is found to be willful." The trial court decided that the violation was not willful and denied the newspaper's motion for costs and attorneys' fees. The Court of Appeals reversed the trial court, stating:

> The Board was acutely aware that discussing its bid in a public meeting would automatically create a disadvantage for it as a bidder in an auction. Nevertheless, the requirements of the Open Meetings Act are clear on their face. The Board went into a closed meeting to discuss a matter of public business. Its closed meeting did not satisfy any of the exceptions to the open meetings mandate. The Board deliberately elected to ignore the requirements of the Open Meetings Act when it proceeded to discuss public business in private. It declined to respond to the open meetings request by the [newspaper]. Its conduct with respect to the clear requirements of the statute was unquestionably willful as construed by *City of Fort Thomas* [*v. Cincinnati Enquirer*, 406 S.W.3d 842, 854 (Ky. 2013)]. Therefore, the trial court erred when it denied the [newspaper's] motion for fees and penalties.

*Bd. of Comm'rs v. Advocate Commc'ns, Inc.*, 2014-CA-001300-MR, 2014-CA-001301-MR (Ky. App., Apr. 29, 2016), slip op. at 10.

While we agree that the Board violated the Act, we find that the violation stemmed more from its effort to avoid the publicity adversely affecting the value of the property and its misconception of the law applicable to bidding at public auction without reserve, than from a willful attempt to violate the Act. In our

9

view, the exception relating to real property acquisition directs its focus to avoiding publicity which could affect value. In hindsight, a public discussion and concomitant decision to bid, without public disclosure of the maximum bid the Board would authorize, would have satisfied the Act's requirements. As we have noted, this case is unique since the real property subject to acquisition was suddenly and without forewarning being offered at absolute auction. Under these facts and circumstances, we do not believe the trial court abused its discretion in denying the newspaper's motion for costs and fees. To that extent, we vacate that portion of the Court of Appeals' opinion.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Stephen Dexter
Sheehan, Barnett, Dean, Pennington, Little & Dexter, P.S.C.


COUNSEL FOR APPELLEE:

Jon L. Fleischaker
Jeremy Stuart Rogers
DINSMORE & SHOHL, LLP

Michael P. Abate
KAPLAN & PARTNERS LLP

COUNSEL FOR *AMICUS CURIAE*
THE MUNICIPAL ATTORNEYS
ASSOCIATION OF KENTUCKY, INC.:

Morgan Todd Osterloh
Sturgill, Turner, Barker & Moloney, PLLC


COUNSEL FOR *AMICUS CURIAE*
KENTUCKY LEAGUE OF CITIES:

Laura Milam Ross
Kentucky League of Cities, Legal Services Counsel